IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SHAWANA WRIGHT, | ) |
| | ) |
| Plaintiff, | ) 2:17-cv-00747-NR |
| | ) |
| v. | ) |
| | ) |
| PROVIDENCE CARE CENTER, LLC and | ) |
| BEAVER VALLEY ASSOCIATES, LLC, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

**J. Nicholas Ranjan, United States District Judge**

Defendants Providence Care Center, LLC and Beaver Valley Associates, LLC have moved for summary judgment [ECF 65] on Plaintiff Shawana Wright's various discrimination-based claims. Providence terminated Ms. Wright shortly following her involvement in a heated altercation with a co-worker. The altercation was witnessed by multiple employees, each of whom submitted witness statements. Those statements served as the substantial basis for Providence's determination that Ms. Wright had engaged in "very serious misconduct" in violation of its established policies. Providence then promptly terminated both Ms. Wright and the other employee involved in the altercation.

Ms. Wright claims that Providence's decision to terminate her based on her involvement in the altercation was pretextual. Ms. Wright argues that she was actually terminated due to her various disabilities and in retaliation for taking leave under the Family and Medical Leave Act (the "FMLA"). She further claims that she was subjected to a hostile work environment while at Providence. Based on these core allegations, Ms. Wright asserts violations of the Americans with Disabilities Act (the "ADA") and the Pennsylvania Human Relations Act (the "PHRA").

None of the evidence offered by Ms. Wright creates a genuine dispute of material fact or otherwise casts doubt on the undisputed fact that her involvement in the altercation was a serious violation of Providence's established code of conduct and, thus, a legitimate reason for firing her. The intervening event of the altercation also renders untenable Ms. Wright's efforts to connect her termination to any protected activity she may have engaged in beforehand. Therefore, the Court will grant Defendants' motion for summary judgment.

## I. FACTUAL BACKGROUND

**A. Ms. Wright's Employment with Providence.**

Ms. Wright is an African-American woman who was employed at Providence for 13 years as a Licensed Practical Nurse ("LPN") until her termination on September 27, 2016. [ECF

67, at ¶ 1]. Providence is a rehabilitation and skilled nursing facility with 180 beds located at 900 Third Avenue, Beaver Falls, Pennsylvania 15010. [*Id.* at ¶ 2].

During her employment, including at the time of her termination, Ms. Wright reported to a number of different supervisors. [*Id.* at ¶ 3]. In September 2016, Bernadette Mehno was the Director of Nursing at Providence [*Id.* at ¶ 4], Bobbye Lutz was the Resident Nurse supervisor [*id.* at ¶ 5], and Raymond DeMarco was the Administrator [*id.* at ¶ 6]. The chain of command was as follows: Ms. Lutz reported to Ms. Mehno who, in turn, reported to Mr. DeMarco. [*Id.* at ¶ 7].

Until the altercation, the parties agree that Ms. Wright was a "fine nurse" and received positive performance evaluations between 2003 and 2014. [ECF 75, at ¶ 16].

**B.     Ms. Wright's Disability and Alleged Poor Treatment.**

Ms. Wright alleges she is disabled because she suffers from allergic asthma, Oral Allergy Syndrome, migraines, depression, and anxiety. [ECF 67, at ¶ 8]. On July 23, 2015, Ms. Wright provided documentation to Providence from her physician regarding her Oral Allergy Syndrome, which causes her to have sensitivity to certain fruits, vegetables, and latex. [*Id.* at ¶ 12]. Her physician requested that raw bananas not be served to Ms. Wright's clients while Ms. Wright was in attendance. [*Id.* at ¶ 13]. According to Providence, it offered a proposed accommodation of switching Ms. Wright to the overnight shift, which she rejected. [*Id.* at ¶¶ 14-15]. However, Ms. Wright's direct supervisor, Ms. Lutz, also testified that no one at Providence had an "interactive dialogue" with Ms. Wright about potential accommodations that could be made for Ms. Wright. [ECF 75, at ¶ 28].

Ms. Wright also asked that latex balloons not be brought near her work area and that she be given time off to deal with disability "flare-ups." [*Id.* at ¶¶ 22-23]. Ms. Wright claims that latex balloons were used to celebrate the "employee of the month" despite management's knowledge of her latex allergy, which caused her to be sick at work. [*Id.* at ¶ 33]. No specific details regarding these events was provided by Ms. Wright, nor were they corroborated by other witnesses. [*Id.* at ¶¶ 33-34].

Ms. Wright further claims that Ms. Lutz "treated her poorly" beginning in 2015. [*Id.* at ¶ 36]. She claims Ms. Lutz: gave her unwarranted discipline [*id.* at ¶¶ 38, 53]; gave her a performance evaluation that was worse than she believed she deserved [*id.* at ¶ 42]; transferred her to a less desirable unit and then transferred her back [*id.* at ¶¶ 43-49]; called her to be "pulled" from her floor after being reinstated [*id.* at ¶ 50]; spoke to her in a rude and condescending manner [*id.* at ¶¶ 58-59]; and ignored her [*id.* at ¶ 58].

**C.     Ms. Wright's FMLA Leave and Return to Work.**

In March 2016, Ms. Wright provided documentation to Providence from her physician for other conditions, including migraines, depression, and anxiety. [ECF 67, at ¶ 16]. This documentation stated that Ms. Wright is "unable to perform any job function during flare-up due to multiple symptoms arising from diagnosis." [*Id.*]. As a result, Ms. Wright exercised her rights under the FMLA and was away from work from March 17, 2016 through July 11, 2016.

[*Id.* at ¶ 18]. According to Ms. Wright, while on leave, Ms. Lutz repeatedly called her, asked her to submit to certain medical testing, and encouraged her to return to work early. [ECF 75, at ¶¶ 65-68].

On May 6, 2016, Ms. Lutz wrote an email expressing a preference that only two of five employees then out on FMLA leave would return. [*Id.* at ¶ 81]. Ms. Wright infers that Ms. Lutz was "speaking in code to her own management that there was no desire for Wright to return to work" without citing any evidence of record to support that inference. [*Id.*]

On July 11, 2016, Ms. Wright returned to work without any restrictions. [ECF 67, at ¶ 21]. Ms. Wright claims that Ms. Lutz had a "bushel of bananas" delivered to the nurses' station the day that she returned from FMLA leave. [*Id.* at ¶ 69]. The bananas were immediately removed. [ECF 75, at ¶ 70]. That same day, Ms. Wright claims Ms. Lutz told her "she did not believe [Ms. Wright] was able to work and should instead go out on Social Security Disability." [*Id.* at ¶ 76]. Ms. Wright's testimony is somewhat vague regarding this alleged statement. For example, Ms. Wright states that she cannot "recall exactly" whether Ms. Lutz even used the terms "quit" or "resign" in the context of the statement. [ECF 75-7, at ¶ 4].

**D.    The Altercation.**

On September 23, 2016, Wright admits that she got into a verbal altercation with a co-worker named Debra Sawyer. [ECF 67, at ¶¶ 31-32, 36]. Ms. Sawyer is not disabled. Several employees either witnessed or heard the altercation and provided written statements. [*Id.* at ¶ 35]. By some accounts, Ms. Wright's yelling could be heard from another floor. [*Id.* at ¶ 34]. One witness said Ms. Wright had to be separated from Ms. Sawyer. [*Id.*]. Providence's management admitted that Ms. Wright "never struck anyone, never verbally threatened anyone, and never used any profane language." [ECF 75, at ¶ 89].

The Providence Care Center Employee Handbook ("PCC Handbook") "establishes work rules for each employee to follow." [ECF 67, at ¶ 22]. The PCC Handbook provides that:

> All employees are expected to conduct themselves in a dignified manner and to observe the basic rules of good conduct while working for [Providence]. These rules involve the exercise of common sense and appropriate conduct in dealing with a supervisor, fellow employees, and residents. Employees are expected to follow instructions and do the work assigned.

[*Id.* at ¶ 24]. The PCC Handbook lists examples of general misconduct, "serious misconduct," and "very serious misconduct." [*Id.* at ¶ 25]. The PCC Handbook characterizes "fighting, assault or any other disorderly conduct" as very serious conduct. [*Id.* at ¶ 26]. The "first offense of … very serious misconduct" may result in discharge. [*Id.* at ¶ 27].

Ms. Wright conceded that her altercation constituted "disorderly conduct" in violation of Providence's policies. [*Id.* at ¶¶ 38-39]. In light of this "very serious misconduct," Providence terminated Ms. Wright on September 27, 2016. [*Id.* at ¶ 42]. Providence also terminated Ms. Sawyer's employment due to her involvement in the altercation. [*Id.* at ¶ 43]. According to

Defendants, three supervisors were involved in the decision to terminate Ms. Wright: Ms. Lutz, Ms. Mehno, and Mr. DeMarco. [*Id.* at ¶ 41].

Following Ms. Wright's termination, a union grievance hearing was held. Both Ms. Wright and her former union representative, Denise Cox, participated in the hearing. [ECF 68-15]. According to the minutes of the proceeding, neither Ms. Wright nor Ms. Cox mentioned alleged discrimination or retaliation during that hearing. [*Id.*].

Ms. Wright alleges that other LPNs engaged in conduct that could be classified as "very serious misconduct" but were not terminated. [ECF 75, at ¶¶ 121-23]. Ms. Wright provides almost no information regarding the particulars of those other incidents, including the specific employee involved or when the conduct occurred. [*Id.*]. Defendants counter that, to the extent they even happened, those incidents involved "nursing errors" rather than intentional misconduct and, therefore, are not comparable. [ECF 83, at 13].

**E.     Ms. Wright's EEOC Charges of Discrimination.**

On September 15, 2015, Ms. Wright filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "First EEOC Charge") alleging that she was "being discriminated against because of [her] race … and [her] disability." [ECF 67, at ¶ 44]. The EEOC dismissed Ms. Wright's First EEOC Charge on June 29, 2016. [*Id.*].

On October 14, 2016, Ms. Wright filed another Charge of Discrimination with the EEOC (the "Second EEOC Charge") and cross filed it with the Pennsylvania Human Relations Commission. [*Id.* at ¶ 48]. According to the Second EEOC Charge, Ms. Wright believed that her termination was "discriminatory (based upon [her] race and/or health) and retaliatory." [*Id.* at ¶ 49]. She also alleged discrimination based on race, national origin, retaliation, and a failure to accommodate/hostile work environment. [*Id.*].

## II.     PROCEDURAL BACKGROUND

Ms. Wright filed her original complaint on June 7, 2017, asserting claims under the ADA, the PHRA, the FMLA, Title VII, and § 1981. [ECF 1].

On September 6, 2017, Defendants partially moved to dismiss Ms. Wright's Complaint on the grounds that many of her claims were either untimely or not encompassed within the scope of her Second EEOC Charge, and, therefore, outside the Court's subject matter jurisdiction. [ECF 6]. On September 27, 2017, Ms. Wright filed her First Amended Complaint in response. [ECF 12]. Defendants then filed a substantially identical partial motion to dismiss the First Amended Complaint on October 10, 2017. [ECF 14].

On December 7, 2017, Judge Conti (the previous judge assigned to this case) granted Defendants' motion in part, dismissing Ms. Wright's racial discrimination claims in their entirety and dismissing Ms. Wright's disability discrimination claims to the extent that they are based on conduct occurring prior to December 19, 2015. [ECF 25, at 17]. Judge Conti allowed Ms. Wright to file a Second Amended Complaint following her order.

On February 15, 2018, Ms. Wright filed her Second Amended Complaint. [ECF 29].

On March 1, 2018, Defendants, once again, moved to partially dismiss and Judge Conti, once again, granted the motion in part. [ECF 32]. On April 12, 2018, Judge Conti entered an order dismissing Ms. Wright's FMLA interference claim and her retaliation claims under Title VII and § 1981. [ECF 38].

Following discovery, on December 13, 2018, Ms. Wright withdrew her remaining racial discrimination claims under Title VII and § 1981. [ECF 63]. All that remains of the Second Amended Complaint are Count I for violations of the ADA, Count II for violations of the PHRA, and Count III for retaliation under the FMLA.

Defendants timely filed a motion for summary judgment on January 23, 2019 [ECF 65], with a brief in support [ECF 66], and concise statement of material facts [ECF 67]. On March 1, 2019, Ms. Wright filed a response to the motion for summary judgment [ECF 72], a brief in opposition [ECF 74], a counter statement of facts [ECF 75], and a response to Defendants' concise statement of material facts [ECF 76]. Defendants submitted a reply to Ms. Wright's counter statement of facts [ECF 82] and reply brief [ECF 83] on March 22, 2019. Defendants' motion is ripe for disposition.

### III. LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the inquiry is whether the evidence presents "a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In making this determination, a court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

If the moving party shows an absence of material fact, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citation omitted). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. *Celotext Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative. *Anderson*, 477 U.S. at 249-50. There must be more than "a scintilla of evidence" supporting the non-moving party and "more than some metaphysical doubt as to the material facts." *Id.* at 252, 261 (internal marks omitted).

## IV. DISCUSSION AND ANALYSIS

### A. Disability Discrimination Claims Under the ADA and PHRA.[1]

#### 1. Applicable Legal Standard.

A plaintiff may prove disability discrimination by direct evidence under a "mixed motive" theory as set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), or indirectly through the burden-shifting framework as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Neustein v. PNC Bank, NA*, No. 15-1045, 2017 WL 3173956, at *6 (W.D. Pa. July 26, 2017).

##### (a) Burden Under *Price Waterhouse*.

If a plaintiff "offers 'direct evidence' of unlawful discrimination … the plaintiff need only show that the unlawful motive was a substantial motivating factor in [the employer's] decision" to take an adverse employment action against the plaintiff. *Miller v. CIGNA Corp.*, 47 F.3d 586, 594 (3d Cir. 1995).

"If plaintiff satisfies this burden, '[b]oth the burden of production and the risk of non-persuasion are shifted to the defendant who … must persuade the factfinder that even if the discrimination was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus.'" *Neustein*, 2017 WL 3173956, at *6 (quoting *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 n.5 (3d Cir. 2016)).

##### (b) Burden Under *McDonnel Douglas*.

If the plaintiff is relying on circumstantial evidence of discrimination, "the court uses a pretext theory, which incorporates the burden-shifting analysis of [*McDonnell Douglas*]." *Neustein*, 2017 WL 3173956, at *6. Under this analysis, "once the employee establishes a *prima facie* case of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision." *Id.* (citation omitted).

"If the employer makes that showing, the burden of production shifts once again to the employee to establish that the employer's proffered justification for the adverse action is pretextual." *Id.* (citation omitted). Throughout this burden-shifting exercise, the burden of persuasion remains on the employee. *Id.* (citation omitted).

---

[1] The parties agree that Ms. Wright's claims under the ADA and PHRA are analyzed pursuant to the same legal standard. *See Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir. 2010) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)). As a result, the Court will address these claims simultaneously throughout this Memorandum Opinion.

## 2. Ms. Wright Has Not Offered Direct Evidence of Her ADA and PHRA Discrimination Claims.

The only "direct evidence" that Ms. Wright offers in support of her disability discrimination claims is that, two months before her termination, one of her supervisors, Ms. Lutz, stated that "she did not believe [Ms. Wright] was able to work and should instead go out on Social Security Disability." [ECF 74, at 10]. That statement, standing alone, does not constitute direct evidence.

A plaintiff attempting to prove discrimination with direct evidence faces a "high hurdle." *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513 (3d Cir. 1999). In order to constitute direct evidence, "the evidence must demonstrate that the 'decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 248 (3d Cir. 2002) (quoting *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998)). "If the trier of fact must infer discrimination from the employer's remarks or actions, then the evidence is not direct evidence of discrimination." *Weightman v. Bank of N.Y. Mellon Corp.*, 772 F. Supp. 2d 693, 702 (W.D. Pa. 2011) (citing *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994)). "Derogatory comments or stray remarks in the workplace that are unrelated to employment decisions, even when uttered by decision-makers, do not constitute direct evidence of discrimination." *Id.*

Ms. Lutz's statement falls under the "stray remark" category for two reasons. First, although the alleged remark was made by one of Ms. Wright's supervisors, it was not "uttered when [Providence] took disciplinary action against [her] or made the decision to terminate her employment." *Kim-Foraker v. Allstate Ins. Co.*, 834 F. Supp. 2d 267, 276-77 (E.D. Pa. 2011). Rather, Ms. Wright concedes that the statement was made at least two months before she was terminated. [ECF 75, at ¶ 76]. Second, it was not made by the sole decision-maker for Ms. Wright's termination—it is undisputed that Ms. Lutz at least consulted two other supervisors during the termination process, neither of whom are alleged to have made such a statement. [ECF 75, at ¶¶ 98-103; ECF 67, at ¶ 41].

Perhaps more telling, the statement itself does not directly reflect discriminatory animus on the part of Ms. Lutz. Ms. Lutz's statement is susceptible to multiple interpretations, including interpreting it as an innocent expression of concern for an employee who was struggling with serious medical conditions. Because of this susceptibility to at least one non-discriminatory interpretation, a factfinder would have to infer from the surrounding circumstances that the statement reflected a discriminatory mindset. To qualify as direct evidence, however, no such inference is permissible. *See Weightman*, 772 F. Supp. 2d at 702. Indeed, "[o]nly the most blatant remarks, whose intent could be nothing other than to discriminate in reaching an employment decision, are considered sufficient to constitute direct evidence of discrimination. *Id.* (holding that comment that "you need to make a decision, either you're going to be a mom or have a career" was not direct evidence of gender discrimination).

The Third Circuit's decision in *Deane v. Pocono Medical Center*, 142 F.3d 138 (3d Cir. 1998) is instructive on what constitutes a "blatant" remark. *Deane* involved discrimination based on perceived disability. The plaintiff produced uncontroverted evidence that the employer's

human resources vice president indicated to the plaintiff that she was being terminated "because of her 'handicap.'" *Id.* at 149. The *en banc* court held that this was "direct evidence that Deane suffered an adverse employment action because of her employer's perception of her disability." *Id.*

Unlike the statement in *Deane*, Ms. Lutz's statement does not unequivocally tie an adverse employment decision to Ms. Wright's disabilities. Rather, the statement at issue is akin to the more ambiguous remarks that courts repeatedly have found to fall short of the "blatant" threshold for constituting direct evidence. *See, e.g., Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 513 (3d Cir. 2004) ("Glanzman's immediate supervisor[] asked Glanzman about her retirement plans. Again, the district court correctly determined that this was not direct evidence of age discrimination and could just as easily be explained by a desire on Metropolitan's part to do some long-term planning."); *Kim-Foraker*, 834 F. Supp. 2d at 277 (no direct evidence of racial discrimination where supervisor stated that he was taking kung fu; that Koreans always use cash; and that Koreans always work hard, so expectations for Kim-Foraker were greater than those for other employees); *Sosky v. Int'l Mill Serv., Inc.*, No. 94-2833, 1996 WL 32139, at *4 (E.D. Pa. Jan. 25, 1996) ("[Supervisor's] comments which could possibly be construed as ageist … at most, reflected Maloney's knowledge of plaintiff's age and years of experience with IMS and so are insufficient to constitute direct evidence of age discrimination."), *aff'd*, 103 F.3d 114 (3d Cir. 1996).

The Court's conclusion that Ms. Wright has not offered direct evidence of disability discrimination does not end the inquiry, however. Ms. Wright is also allowed to offer circumstantial evidence to potentially prove that Providence's decision to terminate was pretextual. Ms. Wright has not met her burden on this front, either.

### 3. Ms. Wright Has Not Offered Sufficient Circumstantial Evidence to Support a Finding of Pretext.

Disability discrimination claims may also be analyzed under the *McDonnell Douglas* burden-shifting framework.

Pursuant to that framework, Ms. Wright must first establish a *prima facie* case of discrimination by showing that: (1) she has a disability; (2) she was qualified for the position with or without a reasonable accommodation; and (3) she suffered an adverse employment action as a result of her disability. *Williams v. Phila. Housing Auth. Police Dept.*, 380 F.3d 751, 761 (3d Cir. 2004). For purposes of the motion, Defendants do not dispute that Ms. Wright has met this burden. [ECF 66, at 7-15].

Once plaintiff has successfully established a *prima facie* case, the burden shifts to the defendant-employer to put forth a non-discriminatory reason for the adverse action. *Fuentes v. Perski*, 32 F.3d 759, 763 (3d Cir. 1994). The Third Circuit has held that this is a "relatively light burden," which is satisfied if the employer can "articulat[e] a legitimate reason for the unfavorable employment decision[.]" *Id.*

Providence asserts that Ms. Wright was terminated for engaging in a disruptive and unprofessional shouting match with her co-worker on September 23, 2016. [ECF 67, at ¶¶ 40-

42]. Providence promptly terminated both employees directly involved in this incident. [*Id.* at ¶¶ 42-43]. Providence considered Ms. Wright's behavior to be "very serious misconduct" under its employee handbook, which she was warned could result in discharge for a first offense. [*Id.* at ¶ 40]. Ms. Wright does not contest that Providence has satisfied its "light burden" or articulating a legitimate reason for her termination. [ECF 72, at 12-19].

Thus, the "burden then shifts back to [Ms. Wright] to establish that the defendant's asserted reason was actually a pretext for discrimination." *Hatch v. Franklin Cnty. Jail*, No. 14-2318, 2017 WL 6397830, at *8 (M.D. Pa. Sept. 29, 2017), *aff'd*, 755 F. App'x 194 (3d Cir. 2018).

In proving pretext, a plaintiff may survive a motion for summary judgment "by *either* (1) discrediting the proffered reasons, either circumstantially or directly, *or* (2) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 764 (emphasis added).

"To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* at 765 (citations omitted). Rather, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder *could* rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the purported] non-discriminatory reasons.'" *Id.* (citations omitted).

"This proof may consist of evidence that: '(1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated [persons not within the protected class] more favorably.'" *Terrell v. Main Line Health, Inc.*, 320 F. Supp. 3d 644, 657 (E.D. Pa. 2018) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 645 (3d Cir. 2015)).

Ms. Wright points to several categories of evidence that she claims are sufficient for a factfinder to reasonably disbelieve Providence's stated reason for her termination, or believe that a discriminatory reason for her termination was more likely than not a motivating or determinative cause of Providence's action. The Court disagrees.

**(a) The Evidence Offered Does Not Cast Doubt on Providence's Reason for Termination.**

According to Providence, Ms. Wright was terminated for her role in the altercation with Ms. Sawyer. [ECF 67, at ¶ 43]. While the particulars of what happened during that altercation may be in dispute, what is not in dispute is that, in response, Providence collected numerous eye witness statements, evaluated those statements, and then took action against Ms. Wright based on the guidelines set forth in Providence's established policies. [ECF 67, at ¶¶ 31-43; ECF 75, at ¶¶ 81-96]. Even if Ms. Wright vehemently disagrees with the version of events described in some

of those statements and believes that Providence came to the "wrong" conclusion about what happened, it does not matter. As the Third Circuit has clearly stated, courts "do not sit as a super-personnel department that reexamines an entity's business decisions." *Brewer v. Quaker State Oil Ref. Corp*, 72 F.3d 326, 332 (3d Cir. 1995) (internal marks and citation omitted). This is true "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers…." *Id.*

The PCC Handbook states that "[e]mployees are expected to observe reasonable standards of conduct and to always consider the best interest of the resident as their primary responsibility." [ECF 68-8, at PCC000812]. Employees are further instructed to exercise "appropriate conduct in dealing with a supervisor, ***fellow employees***, and residents." [*Id.*] (emphasis added). The PCC Handbook classifies "[f]ighting, assault or any other disorderly conduct" as "very serious misconduct" and explicitly warns that a "first offense" of such misconduct "may result in **Discharge**." [*Id.* at PCC000814] (emphasis in original).

Ms. Wright admitted during a grievance meeting related to her termination that: (1) "she did get loud, and told [Ms. Sawyer] 'You will do what I tell you to do'" [ECF 67, at ¶ 37]; (2) her involvement in the altercation violated Providence's policies [*id.* at ¶ 38]; and (3) getting into an altercation with another employee is "disorderly conduct" that the employee handbook warns may result in termination [*id.* at ¶ 39]. Moreover, at that same grievance hearing, neither Ms. Wright nor her union representative mentioned alleged discrimination or retaliation claims. [ECF 68-15]. Thus, Ms. Wright "does not deny serious violations of [Providence's] employee rules, and thus has not provided any evidence that would allow a reasonable jury either to disbelieve [Providence's] nondiscriminatory and non-retaliatory reasons for terminating her, or to believe that any discriminatory or retaliatory animus would have 'had a determinative effect' on her termination." *Oden v. SEPTA*, 671 F. App'x 859, 862 (3d Cir. 2016); *see also Paynter v. Aramark Corp.*, No. 07-2214, 2008 WL 11364245, at *3 (E.D. Pa. Aug. 7, 2008) (granting summary judgment on discrimination claim and explaining that "[t]hough she disputes some of the details surrounding the January 12, 2006 fight, she admitted in her written statement to participating in the altercation" and did not "make any showing that the decision to terminate her—given her involvement in a fistfight *within a prison facility*—was in any way implausible or self-contradictory") (emphasis in original).

**(b)** **The Evidence Does Not Establish That Discrimination Was "More Likely Than Not" a Motivating Factor or Determinative Cause of Ms. Wright's Termination.**

Ms. Wright has also not offered evidence that would allow a reasonable jury to conclude that the application of Providence's conduct policy to Ms. Wright was pretextual. On this point, Ms. Wright attempts to offer comparator evidence in the form of the allegation that "[m]any other staff members who yelled at Lutz, in front of Lutz, or who had altercations in the workplace were never terminated." [ECF 72, at 17]. There are several problems with this supposed evidence.

***First***, although plaintiff "can establish pretext by showing that the employer has treated similarly situated persons not within the protected class … more favorably," Ms. Wright offers no specific details about those other incidents or the other employees involved. *Litzinger v.*

- 10 -

*Allegheny Lutheran Soc. Ministries*, No. 15-306, 2017 WL 3089022, at *8 (W.D. Pa. July 20, 2017). As a result, it is impossible to tell whether those other altercations were as disruptive as the incident involving Ms. Wright or whether those employees were or were not part of the same protected class. This failure is critically important because to be valid comparators, the other employees must be "similarly situated in all respects," including having dealt with the same supervisor, being subjected to the same standard, and engaging in the same conduct. *In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018). There is simply no way for a factfinder to engage in such an analysis based on the current record. *See Litzinger*, 2017 WL 3089022, at *9 (rejecting comparator evidence and granting summary judgment because "other than mentioning her, Litzinger presents no evidence regarding this nurse aide; the record is devoid of any evidence about whether this nurse aide was similarly situated, whether she was younger than 40 or not disabled, or what the circumstances of the underlying incident were").

*Second*, the comparator evidence that must be considered in this case unequivocally supports Providence's stated reason for termination. Providence terminated the other, non-disabled employee, Ms. Sawyer, for her involvement in the altercation. The undisputed fact that Providence took the same adverse employment action against the only other person involved in the alteration significantly undercuts any claim that the same action taken against Ms. Wright was motivated by discriminatory animus. *See Paynter*, 2008 WL 11364245, at *3 (finding no inference of reverse racer-based employment discrimination where both parties were placed on suspension immediately following an altercation and both were terminated on the same day for violating the Workplace Violence Policy).

Accordingly, the Court will **GRANT** Defendants' Motion on Ms. Wright's ADA and PHRA disability discrimination claims in Counts I and II of the Second Amended Complaint.

### B. Hostile Work Environment Claims Under the ADA and PHRA.

#### 1. Existence of Claim.

As a preliminary matter, Defendants "note" in their brief that "the Third Circuit has not expressly confirmed that the ADA even creates a cause of action for hostile work environment." [ECF 66, at 20]. It is unclear to the Court whether Defendants are arguing that a hostile work environment claim does not exist under the ADA. Assuming Defendants are making such an argument, it is misplaced for two reasons.

*First*, the Third Circuit has repeatedly acknowledged the existence of such a claim.

The Third Circuit did so for the first time in *Walton v. Mental Health Association of Southeastern Pennsylvania*, 168 F.3d 661 (3d Cir. 1999). In that case, the Third Circuit concluded that the statutory framework "indicates that a cause of action for harassment exists under the ADA." *Id.* at 666. To reach that conclusion, the Third Circuit pointed to the language of the ADA that states "[n]o covered entity shall discriminate against a qualified individual with a disability because the disability of such individual in regard to…[the] terms, conditions, and privileges of employment." *Id.* at 666 (citing 42 U.S.C. § 12112(a)). The Third Circuit further noted that the Supreme Court previously held that "language in Title VII that is almost identical to the above language in the ADA creates a cause of action for a hostile work environment." *Id.*

(citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 180 (1989)). The Third Circuit then went on to explain that "in the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose—to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well." *Id.* (quoting *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 157 (3d Cir. 1995)) (internal marks omitted). The court, however, stopped just short of expressly confirming the cause of action because the plaintiff below "did not show that she can state a claim." *Id.*

In the years since *Walton*, the Third Circuit has repeatedly analyzed hostile work environment claims under the ADA without so much as mentioning that the existence of the claim remains "unsettled." *See, e.g., Hatch v. Franklin County*, 755 F. App'x 194, 201-02 (3d Cir. 2018); *McGlone v. Phila. Gas Works*, 733 F. App'x 606, 611-12 (3d Cir. 2018); *Ballard-Carter v. Vanguard Grp.*, 703 F. App'x 149, 151-52 (3d Cir. 2017). It is not a stretch to assume that after two decades of unquestioningly analyzing ADA hostile work environment claims, the Third Circuit believes that such a claim exists. The same could be said for all of the district courts in this Circuit. Indeed, this Court could not find a single case from this Circuit in which a court held that such a claim did ***not*** exist.

***Second,*** other Circuit Courts of Appeals that have directly addressed this issue have all held that such a claim exists. *See, e.g., Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001) ("For these reasons, we have little difficulty in concluding that the ADA, like Title VII, creates a cause of action for hostile work environment harassment."); *Flowers v. S. Regional Physician Servs. Inc.*, 247 F.3d 229, 234 (5th Cir. 2001) ("[W]e find that a cause of action for disability-based harassment is viable under the ADA…."). The Court finds the reasoning set forth in *Fox* particularly instructive.

There, the Fourth Circuit concluded that because Congress enacted the ADA after the Supreme Court recognized a hostile work environment claim under Title VII, "we can presume that Congress was aware of the Court's interpretation of 'terms, conditions, or privileges of employment' when it chose to use parallel language in the ADA." *Fox*, 247 F.3d at 175 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-96 (1979)). Such a presumption is especially valid here because in the "ADA itself Congress evidenced its knowledge of, and reliance on, the parallel nature of the two statutes, providing that 'the powers, remedies, and procedures set forth in [Title VII] shall be the powers, remedies, and procedures [the ADA] provides.'" *Id.* (quoting 42 U.S.C. § 12117(a)).

While this Court believes a hostile work environment claim exists under the ADA, it need not reach a final decision on that issue because, even assuming such a claim does exist, Ms. Wright has not shown that she can meet the requirements of the claim.

### 2. **Applicable Legal Standard.**

To establish a hostile work environment claim, Ms. Wright must prove that:

(1) she is a qualified individual with a disability under the ADA;

(2) she was subject to unwelcome harassment;

(3) the harassment was based on her disability;

(4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and

(5) that her employer knew or should have known of the harassment and failed to take prompt effective remedial action.

*Walton*, 168 F.3d at 667 (citations omitted).

"To be sufficiently severe or pervasive, [the] harassment must be shown to be both objectively and subjectively hostile or abusive." *Hatch*, 755 F. App'x at 202. "To determine whether a work environment contains sufficiently severe or pervasive harassment, courts consider the totality of the circumstances." *Id.* "Generally, courts look to whether a workplace was 'so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of [the harassed employees]….'" *Id.* (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)).

Defendants argue that the evidence offered does not establish the type of "severe or pervasive" discriminatory conduct necessary to create an abusive or hostile work environment. [ECF 66, at 21]. The Court agrees.

### 3. The Conduct at Issue Was Not Severe or Pervasive.

Ms. Wright asserts that the conduct to which she was allegedly subjected while at Providence was sufficiently severe or pervasive to constitute a hostile work environment on the basis of her disability. To support her assertion, Ms. Wright cites to a litany of complaints about her workplace. [ECF 72, at 27]. This list of grievances is identical to the one considered by Judge Conti when she originally dismissed Ms. Wright's hostile work environment claim under Title VII. [ECF 25, at 9-10].

That list was adeptly summarized by Judge Conti as follows: "Wright received two pretextual disciplines in January and March 2016…; Lutz encouraged her to go on disability rather than returning to work; Wright was required to come into work while on leave to be tested for tuberculosis; management provided nurses with a bushel of bananas, although aware that Wright was allergic; Lutz ignored Wright and talked to … co-workers; Wright was falsely accused of bullying a co-worker to work on a different floor; Wright was falsely accused of violating the medication errors policy; and Wright was forced to work on days she requested vacation." [*Id.*] Assuming these allegations were true, Judge Conti nevertheless concluded that "[n]one of these allegations is sufficient for this court to infer that there was an extremely serious isolated incident." [*Id.*] She also concluded that "[t]his handful of incidents over nine months, as pled, are not sufficient for this court to reasonably infer that there was pervasive discrimination altering the conditions of Wright's employment." [*Id.*] This Court sees no reason to deviate from Judge Conti's well-reasoned conclusion simply because Ms. Wright has

repackaged her same allegations as a violation of the ADA rather than Title VII. After all, as noted above, Congressional intent and well-established precedent demand that the two statutes be interpreted consistently. Moreover, Judge Conti's conclusion is amply supported by established precedent.

In the Third Circuit, the plaintiff must satisfy a "high" threshold to satisfy the "severe or pervasive" element. *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014). That is because the "ADA anti-discrimination mandate does not require a happy or even a civil workplace." *Ballard-Carter*, 703 F. App'x at 152. "Ordinary tribulations of the workplace, such as the sporadic use of abusive language, jokes, and occasional teasing are not enough to sustain a hostile work environment claim." *Id.* (internal marks and citation omitted).

Although Ms. Wright claims she was subjected to harassing treatment on "a daily and weekly basis," the evidence of record does not support that characterization. At best, Ms. Wright points to a handful of incidents that appear to have been spread out over the course of many months. [*See* ECF 75, at ¶¶ 33-34, 36-37, 43, 49, 53, 58-59, 65-66, 69-70, 71, 76, 81-82]. Such sporadic conduct is not pervasive enough to paint a picture of a hostile work environment permeated by a "steady barrage of opprobrious [discriminatory] comments." *Al-Salem v. Bucks Cty. Water & Sewer Auth.*, No. 97-6843, 1999 WL 167729, at *5 (E.D. Pa. Mar. 25, 1999) (internal marks and citation omitted); *see also Tourtellotte v. Eli Lily & Co.*, No. 09-0774, 2013 WL 1628606, at *6 (E.D. Pa. Apr. 16, 2013) ("No reasonable juror could conclude that these particular encounters over the course of eighteen months amounted to 'pervasive' or regular conduct."); *Sessoms v. Trs. of Univ. of Pa.*, No. 16-2954, 2017 WL 2271817, at *6 (E.D. Pa. May 24, 2017) ("While [plaintiff] characterizes the harassment as very frequent in her deposition testimony, the notes she kept contemporaneously tell a somewhat different story—they outline eleven instances that occurred over the course of nine months.").

Neither are the various incidents, either taken individually or collectively, sufficiently severe. Ms. Lutz telling Ms. Wright that she should "collect disability" [ECF 75, at ¶ 76], treating her in an unspecified "rude and condescending manner" [*id.* at ¶ 58], and ignoring her [*id.*], is not, objectively speaking, the kind of conduct that could "destroy completely the emotional and psychological stability" of someone. *Hatch*, 755 F. App'x at 202; *see also Mlinarchik v. Brennan*, No. 16-257, 2018 WL 4922925, at *5 (W.D. Pa. Oct. 10, 2018) (no hostile work environment where plaintiff's supervisor "told her to go home, take medication, seek out disability benefits, or see a psychiatrist"). Indeed, Ms. Wright even testified that she never reported or complained about the rude or ignorant behavior. [ECF 75-23, at 85:19-86:7].

The Third Circuit has affirmed summary judgment in cases where the plaintiff has offered similar workplace conduct as evidence of a hostile work environment. *See, e.g., Ballard-Carter,* 703 F. App'x at 152; *Lescoe v. Pa. Dep't of Corrections-SCI Frackville*, 464 F. App'x 50, 54 (3d Cir. 2014).

For example, in *Ballard-Carter*, the court found the following comments made about a hearing-impaired employee insufficient:

- "Oh, that's right, I forgot you were deaf";

- "You're supposed to be talking loudly at your desk";

- "We just said that you weren't listening"; and

- Quotations around the word "heard" in an email to the plaintiff regarding a client request.

703 F. App'x at 152.

In *Lescoe*, the court held that frequent "jokes and comments about [plaintiff's] weight, the size of his belly, and not being able to see his groin area" did not "reach a level of sufficient severity or pervasiveness to alter the conditions of his employment." 464 F. App'x at 54.

Ms. Wright's own testimony also undercuts the purported severity of other alleged incidents of harassment. For example, with respect to the bushel of bananas being delivered on her first day back from FMLA leave, Ms. Wright testified that "they were immediately removed after Wright's request for removal." [ECF 75, at ¶ 70].

Ms. Wright's contentions that she was transferred briefly to a less desirable unit, was falsely accused of bullying a co-worker, and falsely accused of violating policies and procedures, similarly do not save the day. First off, it is unclear from the record how any of these actions was connected in any way to her disability. Even assuming that they were connected, such conduct does not cross the line into "severe." *See Andrekovich v. Borough of Punxsutawney*, No. 17-1041, 2018 WL 5442441, at \*10 (W.D. Pa. Oct. 29, 2018) (finding insufficient allegations that plaintiff suffered "verbal abuse, false accusations of criminal conduct and neglect of duty, by his fellow officers; unwarranted disciplinary proceedings and imposition of additional duties which interfered with his ability to do his job; attempts to discredit him with his friends, government officials, co-workers and the public in general; interference with his work equipment and materials; and ostracism by his coworkers") (internal marks omitted).

At bottom, the conduct described by Ms. Wright is materially different from the kind of persistent and extreme harassment that this Court has previously found sufficient to support a hostile work environment claim. *See Mangel v. Graham Packaging Co., L.P.*, No. 14-147, 2016 WL 1266257, at \*5 (W.D. Pa. Apr. 1, 2016); *Martsolf v. United Airlines, Inc.*, No. 13-1581, 2015 WL 4255636, at \*13 (W.D. Pa. July 14, 2015).

For example, in *Mangel*, his co-corkers "made fun of his limp and leg braces, calling him 'Forrest Gump,' 'cripple,' 'Gumby,' and 'crippled ninja.'" 2016 WL 1266257, at \*5. This harassment also included his supervisor calling him "ratchet ass" and "Gumby." *Id.*[2]

In *Martsolf*, plaintiff testified that her co-workers "constantly screamed at her when she could not hear them, complained when they could not understand her, and mocked and imitated the way that she spoke." 2015 WL 4255636, at \*13. She was also subjected to insults of "stupid or dummy" and other co-workers "making faces and gestures of a gun to the head" toward her.

---

[2] Significantly, the mistreatment suffered by plaintiff in *Mangel* was also corroborated by a co-worker. 2016 WL 1266257, at \* 5.

Unlike in those cases, none of the acts of which Ms. Wright complains, either singularly or in combination, were so severe or pervasive as to change the conditions of her employment. The Court will **GRANT** Defendants' motion as to Ms. Wright's hostile work environment claims under the ADA and PHRA in Counts I and II of the Second Amended Complaint.

**C.     Retaliation Claims under the ADA, PHRA, and FMLA.**

**1.     The Court Has Subject Matter Jurisdiction Over Ms. Wright's Retaliation Claim under the ADA.**

Defendants first argue that this Court lacks subject matter jurisdiction over Ms. Wright's ADA retaliation claim because it relies upon alleged conduct that is unrelated to her termination. [ECF 66, at 15-16]. Defendants premise this argument on two claims. First, Ms. Wright did not indicate that her retaliation claim was "ongoing" in her Second EEOC Charge. [*Id.* at 15]. Second, Ms. Wright testified during her deposition that her retaliation allegation is based on the protected activity of filing her First EEOC Charge in September 2015. [*Id.* at 15-16]. Neither is sufficient to wrest away the Court's jurisdiction to hear this claim.

The Court finds that Ms. Wright sufficiently alleged that she experienced retaliation for her termination *and* for discussing her health issues and accommodation needs in her Second EEOC Charge. [ECF 73-20]. It is of no moment that Ms. Wright did not allege that she was suffering any "ongoing" problems in her Second EEOC Charge because her employment had already ended, so it is reasonable that she believed, by definition, that it could not be "ongoing." Ms. Wright also indicated that she had been subjected to a hostile work environment in the Charge, which implicates a period of time predating her termination. "An administrative charge is not…a blueprint for the litigation to follow" and Ms. Wright did enough on her Second EEOC Charge to put Defendants on notice. *See Reddinger v. Hosp. Cent. Servs., Inc.*, 4 F. Supp. 2d 405, 410 (E.D. Pa. 1998).

Ms. Wright's testimony regarding the basis for her legal claims is also not dispositive on the issue of this Court's jurisdiction. Ms. Wright is not required to know the precise contours of all of her legal claims—that is the job of counsel.[3]

Therefore, the Court finds that it has jurisdiction to consider Ms. Wright's ADA retaliation claim. However, this claim, along with Ms. Wright's other retaliation claims under the PHRA and FMLA, fail for the reasons set forth below.

**2.     Applicable Legal Standard.**

Where, as is the case here, direct evidence is lacking, retaliation claims asserted under the ADA, PHRA, or FMLA are also analyzed under the *McDonnell Douglas* burden-shifting

---

[3]     This testimony is, however, relevant to the analysis of the viability of her retaliation claim, as discussed below.

framework.[4] *See Williams*, 380 F.3d at 759 n.3; *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012).

The first step is the same regardless of the statute being invoked: Ms. Wright must establish a *prima facie* case, which requires a showing that "(1) she was engaged in 'protected activity,' (2) she experienced an adverse employment action, and (3) there was a causal connection between the employee's involvement in protected activity and the adverse employment action." *Hatch*, 755 F. App'x at 200 (citation omitted). Ms. Wright has not satisfied her burden with respect to the third element.

### 3. Ms. Wright Has Not Established a Causal Connection Between Her Termination and Any Protected Activity.

Ms. Wright argues in her briefing that she engaged in three protected activities: (1) filing her First EEOC Charge on September 15, 2015; (2) requesting accommodations for her disability; and (3) taking FMLA block-medical leave from March 2016 through July 2016. [ECF 72, at 22-23]. At the outset, the Court notes that Ms. Wright's position in her summary judgment briefing is inconsistent with the testimony she provided during her deposition that she believed her First EEOC Charge was *the* basis for the alleged retaliation she suffered:

> MS. WRIGHT: [Ms. Lutz] was mad at me because I filed EEOC charges against her, and she found any way possible to get back at me, and she found the first thing to fire me for, and that's what she did.
>
> Q: That first thing – so you're claiming that she's retaliating against you for filing an EEOC charge?
>
> A: Yeah, because I never did anything to her. Nothing. I never disrespected her. I never got smart with her. I never did anything.

[ECF 75-23, at 234:21-235:8]. Putting this inconsistency aside, Ms. Wright cannot establish a causal connection between any of these protected activities and an adverse employment action.

A causal link between protected activity and adverse activity may be inferred from an unusually suggestive temporal proximity between the two events, an intervening pattern of antagonism following the protected conduct, an employer's inconsistent explanation for taking an adverse employment action, or the proffered evidence examined as a whole. *Carvalho-Greivous v. Del. State Univ.*, 851 F.3d 249, 2860 (3d Cir. 2017). Ms. Wright concedes that "[t]he adverse action in this case occurred in September of 2016, when Plaintiff was terminated." [ECF 20, at 11-12].

Here, too much time passed between any of the protected activities and her termination on September 27, 2016 to be "unusually suggestive." Ms. Wright filed her First EEOC Charge more than 12 months before her termination. [ECF 67, at ¶ 48]. The last accommodation sought by Ms. Wright was her request for extended FMLA leave. [*See generally* ECF 75]. She returned

---

[4] Ms. Wright concedes she is proceeding on a pretext theory for her retaliation claims. [ECF 72, at 23-25].

from leave on July 11, 2016—more than two months before she was terminated. [*Id.* at ¶ 18]. "Two months is not so close to be unduly suggestive of causation." *Moore v. Shinseki*, 487 F. App'x 697, 698 (3d Cir. 2012) (affirming grant of summary judgment in Title VII case); *see also Williams*, 380 F.3d at 760 (holding two months between protected activity and adverse employment action not unduly suggestive); *Davis v. Davis Auto, Inc.*, No. 10-3105, 2011 WL 5902220, at *10 (E.D. Pa. Nov. 22, 2011) ("When more than two months lapses between the request for an accommodation and the date of termination, the temporal proximity is not so close as to be unduly suggestive, and the plaintiff must put forth other evidence to demonstrate a causal link.").

Absent temporal proximity, other evidence, looked at as a whole, may also suffice to raise the inference of an employer's retaliatory motive. *Rhoden v. Childrens Hosp. of Pittsburgh of UPMC Health Sys.*, 749 F. App'x 86, 90 (3d Cir. 2018). The reason being that "it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir. 1997).

In this case, any potential for an inference breaks down because of the intervening event of the altercation, which occurred just four days before her termination. "[A] causal link between an employee's protected activity and an adverse employment action against that employee may be broken by intervening events…." *Outten v. Genesis Health Care, LLC*, No. 13-4708, 2014 WL 3964918, at *12 (E.D. Pa. Aug. 12, 2014). Even assuming that Ms. Lutz's stray remarks and allegedly rude behavior directed toward Ms. Wright that occurred between the last of Ms. Wright's protected activities and her termination could be evidence of a "causal link," Ms. Wright broke the causal chain when "she undisputedly engaged in conduct that went against a known practice of [Providence] and for which [Providence says it] terminated her." *Id.*; *see also Calero v. Cardone Indus., Inc.*, No. 11-3192, 2012 WL 2547356, at *10 (E.D. Pa. June 29, 2012) (causal link between plaintiff's FMLA leave and plaintiff's termination was broken where plaintiff—a factory worker—lied to his employer about his arrival times); *Naber v, Dover Healthcare Assocs., Inc.*, 765 F. Supp. 2d 622, 647 (D. Del. 2011) (causal link between plaintiff's request for FMLA leave and plaintiff's termination was broken where plaintiff—a recreation assistant at a nursing home facility—falsified records).

Not every case will present such a clear instance of an intervening event cutting off any potential inference of retaliatory conduct. Here, the Court is presented with an undisputed, discrete event (i.e., the altercation) that occurred just four days before the termination, while all of the protected activities occurred many months earlier. The close proximity between the altercation and the termination, and the distance from when Ms. Wright engaged in protected activity is strong evidence of an intervening causal event.

Thus, even viewing the record in the light most favorable to Ms. Wright, the Court cannot find that Ms. Wright has met her burden to establish a prima facie case for retaliation under any statute because she cannot show a causal link between any of her alleged protected activities and her termination. The Court will **GRANT** Defendants' motion as to Ms. Wright's retaliation

claims under the ADA, PHRA, and FMLA in Counts I, II, and III of the Second Amended Complaint.[5]

## V.    CONCLUSION

For all of the reasons discussed above, Defendants' Motion for Summary Judgment [ECF 65] will be **GRANTED** in its entirety. An appropriate Order follows.

DATED this 24th day of September, 2019.

BY THE COURT:

*/s/ J. Nicholas Ranjan*
United States District Judge

---

[5] The Court need not address Defendants' argument that Beaver Valley cannot be liable to Ms. Wright under the ADA, PHRA, and FMLA because the Court has dismissed all substantive claims on other grounds.